**DON CARTAGE COMPANY**
v.
**UNITED STATES of America.**

**UNITED STATES of America**
v.
**DON CARTAGE COMPANY.**
Nos. 14135, 14136.

United States Court of Appeals
Sixth Circuit.
April 24, 1961.

John W. Babcock, Detroit, Mich., for Don Cartage Co.

Marvin S. Shapiro, Dept. of Justice, Washington, D. C., for U. S., George Cochran Doub, Asst. Atty. Gen., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., Fred W. Kaess, U. S. Atty., Detroit, Mich., on the brief.

Before MILLER, Chief Judge, and McALLISTER and O'SULLIVAN, Circuit Judges.

McALLISTER, Circuit Judge.

The primary issue in this case is whether appellant cartage company contracted with the government to transport an X-ray machine in an interstate shipment from Illinois to Pennsylvania. Appellant sued the government for services in connection with such shipment and also for various other services. It denied that it had agreed to transport the X-ray unit from Chicago to Pennsylvania, asserting that it had contracted only to prepare the property for shipment and to deliver it to a common carrier engaged in interstate transportation. The district court found that appellant had contracted to transport the X-ray unit to Pennsylvania and that it was liable for damages resulting to the property arising from collisions en route.

To appellant, for the total of its services, the court granted judgment, with taxable costs, allowing, at the same time, an off-set to the government for the damages to the X-ray unit. Defenses of laches, advanced by appellant, were resolved in favor of the government. From the judgment, the Don Cartage Company appealed; and from the allowance of the above-mentioned costs, the government filed a cross-appeal.

The pertinent facts are as follows: The government, in October, 1955, undertook to ship a mobile X-ray unit from the Standard Pullman Company plant in Chicago, to the Hunter Manufacturing Company in Bristol, Pennsylvania. As the first step in making such shipment, on October 5, a government official in the Chicago Ordnance District of the Department of the Army requested authorization therefor, stating that the unit was urgently needed by the Bulova Research and Development Laboratory in its work for the Army, at Bristol, and that the government had negotiated with the Don Cartage Company for the removal of this equipment at a cost of $995. The requested authorization was granted by the contracting officer of the government, and pursuant thereto, a "Shipping Order" dated October 5, 1955, was issued by the government directing the shipment to the Bulova company. This Shipping Order, after detailing the method by which the unit was to be prepared for shipment, stated:

"* * * the above preparation for shipment and the transporting to destination of above equipment will be accomplished by the Don Cartage Company for a total cost of $995. These services will be covered by a purchase order which will follow at an early date."

On October 6, 1955, the Don Cartage Company received the government "Material Inspection and Receiving Report" dated October 5, 1955. This document, received by the Don Cartage Company, sets forth that:

"preparation for shipment and the transporting to destination of above equipment will be accomplished by the Don Cartage Company. Services will be covered by a Purchase Order which will follow at an early date."

On the same day, the Don Cartage Company prepared the X-ray unit for shipment and conveyed it to, and loaded it upon, a Roadway Transit Company truck. The unit was then carried by the Roadway Transit Company on a bill of lading prepared by the Don Cartage Company in which it designated itself as "carrier," and the Roadway company as the "delivering carrier." The bill of lading made no reference to, or mention of, the government. It set forth that the shipment was consigned to the Bulova company. It incorporated the provisions of the uniform straight bill of lading, which provides that "claims [for damages] must be filed * * * within nine months after delivery of the property." The freight bills, pertaining to the Roadway company's services, referred to the Don Cartage Company as the shipper, with no reference therein to the government.

En route to Bristol, Pennsylvania, the X-ray unit was involved in two accidents and was finally delivered to the Bulova company in a damaged condition on October 20, 1955. Prompt investigation into the extent of the damage to the unit was made by the government, and the Don Cartage Company was informed of the accidents shortly after receipt of the machine by the Bulova company, and long before the expiration of the nine-month period for filing a claim against the Roadway company, which had been designated as the delivering carrier by the Don Cartage Company.

However, after the government advised the Don Cartage Company of the accidents, that company took no action whatever at any time to investigate the nature of the accidents or damages, nor did it present any claim against the Roadway company until long after the nine-month period for the filing of such claims had elapsed.

On February 4, 1958, however, the Don Cartage Company filed its claim for the damages with the Roadway Transit Company, which, in turn, declined to accept the claim on the ground that it had not been filed until twenty-eight months after the date of the shipment, whereas the bill of lading had provided that all claims must be filed within nine months of the date of shipment.

It appears that, after the completion of all of its services, the Don Cartage Company had, during November, 1955, requested the government to issue the "Purchase Order" mentioned in the Shipping Order and Material Inspection and Receiving Report. The purpose of this purchase order was to show what services were to be rendered by Don Cartage, and what payment was authorized by the government for such services.

On February 7, 1956, the purchase order was issued. It set forth that, for the amount of $995, the services to be rendered by the Don Cartage Company to the government were to consist of the following: "(1) Clean all exterior surfaces, (2) the large column on X-ray unit is to be dismantled, cleaned, sprayed with a light perservative oil and boxed, (3) dismantle, clean and box arm shaft, (4) dismantle small unit on side of machine and box, (5) disconnect switch boxes and electrical equipment, (6) brace and block transformer, (7) clean and paint track unit, (8) block complete X-ray unit under the springs, (9) load and block on highway carrier acceptable to carrier, (10) cover with Government-owned tarpaulin, and (11) transport to Bulova Research and Development Laboratory, Bristol, Pennsylvania, in accordance with shipping order. * * *"

On April 20, 1956, the government requested Don Cartage's acceptance of the Purchase Order, which, the government stated, "constitutes your contract with the United States of America." In answer to this request, Don Cartage Company, by its Vice President, filed written acceptance of the Purchase Order, which, as above indicated, provided for payment of $995 for the services therein mentioned, including loading and transporting of the X-ray unit to Bristol, Pennsylvania.

The next development in the case was on November 15, 1957, when the government contracting officer sent the Don Cartage Company his final determination as to the loss suffered by the government, arising out of the damage to the mobile X-ray unit, in the amount of $8,039, and requested payment therefor from the Don Cartage Company. The company refused to pay. It was informed that it could appeal the contracting officer's determination to the Armed Services Board of Contract Appeals. It did not appeal.

On April 16, 1958, the Don Cartage Company submitted the following invoice for its services:

"To preparation for shipment and transporting from * * * Chicago, Illinois, to * * * Bristol, Pennsylvania, one Westinghouse X-ray Unit and Attachments, $995.00."

The government, however, declined to pay the sum of $995 for Don Cartage's services for preparation and transportation to Bristol, Pennsylvania, inasmuch as it claimed from the Don Cartage Company the amount of $8,039.00 for damages arising out of the transportation of the unit.

Don Cartage Company then filed suit against the government seeking recovery of the amount of $8,039.00, which included the sum of $995 for its services in the X-ray shipment, and, in addition, $7,044 for other services rendered to the government on an entirely separate contract, which services were admittedly satisfactory. To this suit, the government filed a counterclaim in the amount of $8,039, the amount of damages it claimed against Don Cartage Company, arising out of the X-ray shipment.

On a trial without a jury, the district court found that the Don Cartage Company had contracted to transport the X-ray unit to Bristol, Pennsylvania, and was, therefore, responsible for the dam-

age that occurred while the unit was in the hands of its delivering carrier. However, the court found that the damage to the X-ray unit was $5,889.25, rather than $8,039, and therefore allowed the government to set off only the former amount against the valid claim of the company, with the result that a judgment was entered in favor of the Don Cartage Company against the government in the amount of $2,149.75.

We are of the view that the evidence clearly sustains the finding that Don Cartage Company agreed with the government to transport the X-ray machine from Chicago to Bristol, Pennsylvania. To repeat, in some degree, this evidence consists of the following: Just before the commencement of its services, the Don Cartage Company received from the government the Material Inspection and Receiving Report stating that "preparation for shipment and the transporting to destination * * * will be accomplished by the Don Cartage Company." The Shipping Order, introduced in evidence and relied upon by appellant company, after referring to the services to be rendered with regard to the X-ray machine, stated that the preparation for shipment and the transporting to Bristol, Pennsylvania, would be accomplished by the Don Cartage Company for a total cost of $995. The invoice of Don Cartage Company set forth: "To preparation for shipment and transporting from * * * Chicago, Illinois to * * * Bristol, Pennsylvania * * * $995.00." The Purchase Order states that Don Cartage Company's duties with respect to the X-ray machine included "transport to * * * Bristol, Pennsylvania." Moreover, there is the additional evidence of the bill of lading heretofore mentioned, in which the Don Cartage Company designated itself as the carrier and referred to the shipment as an X-ray unit consigned to Bristol, Pennsylvania.

The inconclusive testimony of one of the officials of the Don Cartage Company that the contract between the government and the company was oral, and that no one connected with the Don Cartage Company made any contact with the Roadway Transit Company, the delivering carrier; the fact that the latter was referred to in the "Material Inspection and Receiving Report" under the section entitled "Routing;" and the circumstance that the Don Cartage Company was not a common carrier—are not conclusive as proving that appellant company did not contract to transport the X-ray machine to Pennsylvania. The question whether the government or the Don Cartage Company selected the Roadway Transit Company as the carrier to convey the X-ray unit from Chicago to Pennsylvania depends not only upon the interpretation to be given the written instruments in the case, but also as to whether the evidence of the claimed oral agreement is sufficient to sustain appellant's contention. In our view, the proper construction of the written instruments clearly indicates that the Don Cartage Company agreed to transport the X-ray unit from Chicago to Pennsylvania. On the question of fact, we are of the view that the court's finding, adverse to appellant, with regard to the oral agreement, is sustained by substantial evidence.

The conclusion of the district court that the Don Cartage Company contracted to transport the government's X-ray unit to Bristol, Pennsylvania, and was therefore responsible for the damage incurred in the collisions en route to that destination, is sustained.

On the defense of laches asserted by appellant, it appears that the Don Cartage Company, which had agreed to transport the X-ray machine to Pennsylvania, and its delivering carrier, were the only parties mentioned in the bill of lading, which provided that claims for damages must be filed within nine months after delivery of the property. The government was not a party mentioned in the bill of lading. We do not find meritorious appellant's claim of laches that the government did not file its claim against the Don Cartage Com-

pany within the nine-month period provided in the bill of lading.

As to taxation of costs, the government maintains that the district court was in error in authorizing taxation, in favor of appellant, of the following costs: $15.00—entry fee paid to the clerk; $68.00—charge of the court reporter for taking and transcribing depositions; $79.61—expenses of Don Cartage's attorney for hotel, meals, and transportation incurred in taking depositions; and $5.10—per diem witness fee and mileage paid for production of documents.

■ Appellant secured judgment against the government over and above the amount of the latter's counterclaim. Ordinarily such a successful party would be entitled to taxable costs.

However, Title 28 U.S.C.A. § 2412(a) sets forth that "the United States shall be liable for fees and costs only when such liability is expressly provided for by Act of Congress."

The trial court nevertheless determined that costs in favor of appellant in this case were warranted by virtue of the provisions of Title 28 U.S.C.A., § 2412(b), which provides:

"In an action under subsection (a) of section 1346 or section 1491 of this title, if the United States puts in issue plaintiff's right to recover, the district court or Court of Claims may allow costs to the prevailing party from the time of joining such issue. Such costs shall include only those actually incurred for witnesses and fees paid to the clerk." *

The government contends that it did not, in the language of the above quoted section of the statute, put "in issue plaintiff's right to recover."

■ In passing upon this question, it may be observed that it is an established rule that if a person successfully defends an action brought by the United States, he is, nevertheless, not entitled to costs. United States v. Poling Russell, Inc., 2 Cir., 212 F.2d 184. If a person sues the United States, and the latter puts in issue his right to recover, the court, by statute, may allow costs to the prevailing party from the time of joining such issue. Title 28 U.S.C.A. § 2412(b).

■ In the instant case, appellant sued the United States for its services. The United States did not put in issue appellant's claim for services, but admitted the merits and validity of such claim. Nevertheless, it refused to pay until its own claim for damages against appellant was adjudicated. Appellant denied the validity of the government's claim for damages, and, accordingly, that claim—and not the claim of appellant— was the only claim in issue. Under the rule of sovereign immunity, the government was not subject to costs; and the partial waiver of such immunity by virtue of the statute above referred to, is not here applicable. Discussion or determination of other questions raised in the arguments and briefs is unnecessary to decision of this case.

In accordance with the foregoing, the judgment of the district court is affirmed, and the order taxing costs against the United States is reversed.

---

* Section 1346 of Title 28 U.S.C.A. provides that the district courts shall have original jurisdiction concurrent with the Court of Claims of any action against the United States, founded upon any express or implied contract. Section 1491 of the same title provides that the Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded upon express or implied contract.